**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Kent Albers, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING SUMMARY** |
| | ) | **JUDGMENT** |
| vs. | ) | |
| | ) | |
| Deere & Company, | ) | |
| | ) | Case No. 1:08-cv-040 |
| Defendant. | ) | |

───────────────────────────────────────────────────────────

Before the court is the Motion for Summary Judgment filed by defendant Deere & Company ("Deere").  For the reasons set forth below, the motion is granted.

**I.    BACKGROUND**

On August 5, 2003, plaintiff Kent Albers purchased a used 2001 John Deere 9650Wcombine, serial number H09650W690854, from Jamestown Implement Company, an authorized Deere dealer.   At the same time, Albers also purchased an older, 1995 John Deere header, serial number H00930P641204.

The purchases were made pursuant to a single purchase-order contract that was a standard, two-page Deere form for the purchase of Deere products sold in the United States.  The purchase order identified the combine and header as separate products and stated the following with respect to the quantity, description, product ID number, and delivered cash price for each:

| | | | |
|---|---|---|---|
| 1 | Used John Deer 9650 W Combine, Level Land, Dual A Matic, Dial A Speed For & Aft, Green Star Yield 20' Augur, Maurer Tank Ext., Double Vittitoe Chaff Spreader | HO9650W690854 | $112,000.00 |
| 1 | Used John Deere 930 Rigid Head W/Finger Reel, Change Shafts to Fifty Series | H00930P641204 | $5,500.00 |

1

Notably, the entry for the header stated it was modified for use on the "Fifty Series" model of combine being sold.

The second page of the purchase order set forth a matrix of John Deere's standard warranties, disclaimers of implied warranties, and limitations upon remedies for both new and used equipment. The net result was that no warranties were provided. John Deere's standard warranties did not extend to used equipment and all implied warranties were disclaimed.

On October 28, 2007, the combine ignited and burned near the city of Center, North Dakota. Both the combine and header were destroyed. Albers contends the fire was caused by a defective bearing in the combine's "straw walker."

On March 5, 2008, Albers initiated this action in state court seeking to recover $119,814 in damages for the loss of the combine, header, and fuel. His complaint contains five separate causes of action: (1) negligent design or manufacturing; (2) negligent failure to warn; (3) contract/breach of warranties; (4) strict liability for manufacturing; and (5) strict liability for failure to warn.

Deere removed the action to this court on April 7, 2008, and filed its motion for summary judgment on May 29, 2008 to which Albers responded. On August 13, 2008, the court held a hearing on the motion.

In support of its motion, Deere argues: (1) the economic loss doctrine bars Albers's tort claims; (2) the statute of limitations bars his claims for breach of warranty; and (3) no warranties were provided. Albers responds by arguing that the economic loss doctrine does not apply because of the physical damage to the header and the fuel onboard the combine, which Albers characterizes as "other property." With respect to his warranty claims, Albers argues that there are fact issues regarding whether Deere conspicuously and properly disclaimed its warranty liability and that

2

allowing Deere to escape all responsibility for its contractual responsibility for the combine would be unconscionable under the circumstances.

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  If the moving party has supported its motion for summary judgment, the nonmoving party has an affirmative burden placed on it to go beyond the pleadings and show a genuine triable issue of fact.  Commercial Union Ins. Co. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992).  However, the court considering a motion for summary judgment must view the evidence in the light most favorable to the nonmoving party who enjoys "the benefit of all reasonable inferences to be drawn from the facts."  Vacca v. Viacom Broadcasting of Missouri, Inc., et al., 875 F.2d 1337, 1339 (8th  Cir. 1989).

The court will turn first to the most difficult issue, which is whether the economic loss doctrine bars Albers's tort claims.  But first, it is helpful to understand how the combine and header interrelate.

As the name implies, a "combine" is a farm implement that combines several different functions in harvesting crops into one machine, including reaping (cutting or gathering the crop), threshing (separating the grain from the plants), and cleaning the grain.  The "header" is the intake mechanism that gathers the crop and feeds it into the combine.  The header may also perform other functions, depending upon the type of combine and header, including, for example, cutting the crop.

Also, different crops may require different headers.  See generally Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1078-1079 (8th Cir. 1999); Russell v. Deere & Co., 61 P.3d 955, 957 (Or. Ct. App. 2003).

## II.   THE "ECONOMIC LOSS DOCTRINE" AS A BAR TO THE TORT CLAIMS

### A.   Introduction

" Products liability grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty." East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 866 (1985).   To provide that protection, courts in many jurisdictions turned to tort law to expand the scope of liability and create additional  incentives for manufacturers to make safer products.   But, to prevent contract law from "drown[ing] in the sea of tort," most jurisdictions have since imposed limits on that tort recovery, including invocation of some form of the "economic loss doctrine."  Id. at 866, 868-871.

As applied in the products-liability context, the economic loss doctrine limits tort recovery for "economic loss," which is often defined to include physical damage to the defective product and sometimes to other property. It is not, however, a fixed rule of general applicability.  There are numerous permutations and exceptions among the various jurisdictions that often produce  different outcomes in factually similar cases.  In large part, the lack of a consensus over when and how the doctrine should be applied is due to the courts (and sometimes the legislatures) striking the balance differently between the interests protected by tort and those protected by contract.[1]

---

[1]  For a more complete discussion and illustration of the lack of consensus, the following recent articles discuss many of the relevant cases and offer completely different suggestions for more a more uniform approach to applying the economic loss doctrine:  Ralph Anzivino, The Economic Loss Doctrine: Distinguishing Economic Loss from Non-economic Loss, 91 Marq. L. Rev. 1081 (2008) (arguing for more uniformity in defining economic loss); MacKenzie Walter, The Solution to the Economic Loss Doctrine Confusion: The Disappointed Expectations Test, 95 Ky. L.J 943 (2007) (arguing for Wisconsin's "disappointed expectation's" approach to applying the economic loss doctrine);

4

The North Dakota Supreme Court applies the economic loss doctrine in products-liability cases, but has yet to give specific guidance regarding the extent to which tort recovery is permitted for damage to property other than the defective product itself, or what is generally referred to as "other property." To the extent this is an issue, Deere argues that the decision by the Eighth Circuit Court of Appeals in Dakota Gasification Co. v. Pascoe Building Systems, 91 F.3d 1094, 1098 (8th Cir. 1996) is controlling in this case.

In Dakota Gasification, a case arising out of this district, the Eighth Circuit applied an expansive approach to the economic loss doctrine in terms of limiting tort recovery for damage to "other property" in commercial cases, predicting it would ultimately be adopted by the North Dakota Supreme Court. However, in the twelve years that have passed since Dakota Gasification, the North Dakota Supreme Court has yet to adopt its expansive approach and subsequent developments cast some doubt on whether it will do so. To explain why, it is necessary to first provide some context, beginning with the United States Supreme Court's landmark decision in East River, supra, which the North Dakota Supreme Court has squarely embraced, both in terms of its ultimate holding and, more importantly to this case, its balancing of the competing tort and contract principles involved.

B.   **Background**

1.   **The Supreme Courts's decisions in East River and Saratoga Fishing**

In East River, the plaintiffs were seeking to sue the manufacturer of four ships whose turbines failed as a result of a product defect within the turbines that caused only economic loss, *i.e.*, the costs for repair of the turbines and loss of income while the ships were out of service for the

---

Gennady Gorel, The Economic Loss Doctrine: Arguing for the Intermediate Rule and Taming the Tort-Eating Monster, 37 Rutgers L.J. 517 (2006) (arguing why a "substantial danger to persons and other property" test produces less arbitrary results and better advances public policy).

repairs.  In deciding whether there could be recovery in tort for the losses under admiralty law, the Supreme Court first discussed the historic development of applying tort law in products-liability cases.  The Court noted that tort recovery is almost always allowed when a defective product causes bodily injury, referring to such cases as the "paradigmatic products-liability action." 476 U.S. at 866. The Court also observed that, for similar concerns of public safety, many courts also permit tort recovery for damage to "other property," which the Court defined to be property other than the product itself.  Id. at 867.

After making these points, the Court in East River then addressed whether tort recovery would be permitted in the case before it.  The Court noted that other courts across the country had taken one of three positions in cases where the damage was only to the product itself.  One position was to deny tort recovery when the defective product causes injury only to the product and not bodily injury or injury to "other property."  A second, "minority approach" permitted tort recovery even when the only injury caused by the defect was to the product and regardless of whether the defect created an unreasonable risk of harm.  A third "intermediate position" permitted tort recovery if the defect created a substantial danger to persons and other property, regardless of whether personal injury or damage to other property actually occurred.  Id. at 868-871.  After discussing the contract and tort interests relevant to each of these three positions, the Supreme Court rejected the "minority" and "intermediate" approaches and adopted the first-stated approach that there can be no tort recovery (either in negligence or strict liability) when the only injury claimed is damage to the product itself.  Id. 870-876.

While East River did not involve a claim for damage to "other property" (or at least one that was recognized by the court), the clear implication of the Supreme Court's discussion in that case

was that tort recovery would be permitted if the product defect caused bodily injury or damage to "other property" or, conversely, that the economic loss rule only insulates manufacturers from tort liability for damage to the product itself. <u>Id.</u> This was later confirmed by the Supreme Court in its decision in <u>Saratoga Fishing Co. v. J.M. Martinac & Co.</u>, 520 U.S. 875(1997). In that case, which will be discussed in more detail later, the Court stated the following:

> The issue before us concerns limits upon the damages that a tort plaintiff in admiralty can recover for physical damage to property caused by a defective product. In <u>East River S.S. Corp. v. Transamerica Delaval Inc.</u>, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the Court held that an admiralty tort plaintiff cannot recover for the physical damage the defective product causes to the "product itself"; but the plaintiff can recover for physical damage the product causes to "other property."

<u>Id.</u> at 877.

Since the Supreme Court's decision in <u>East River</u>, many of the jurisdictions that had not yet weighed in on whether the economic loss doctrine should be applied in this context followed <u>East River</u>. <u>See</u> Restatement (Third) of Torts: Products Liability § 21 cmt. d. (1998). Also, a few of the courts that previously had followed some form of the "minority" or "intermediate" approaches adopted the <u>East River</u> approach. <u>Id.</u>

### 2. More expansive applications of the economic loss doctrine

Some courts have adopted more expansive approaches to the application of the economic loss doctrine that go beyond the strict "product/other property" dichotomy. For example, in cases involving the sale of commercial products, the Michigan courts have adopted a "foreseeability approach" that prohibits recovery in tort for damage to "other property" if the damage was a direct and consequential loss that was within the contemplation of the parties and could have been the subject of the purchase negotiations. <u>Detroit Edison Co. v. NABCO, Inc.</u>, 35 F.3d 236, 241 (6th Cir. 1996); <u>Neibarger v. Universal Cooperatives Inc.</u>, 486 N.W.2d 612 (1992).

The Eighth Circuit predicted in <u>Dakota Gasification</u> that the North Dakota Supreme Court would adopt this approach, characterizing it as a "modern trend," 91 F.3d at 1099-1101, but this was before the Supreme Court's decision in <u>Saratoga Fishing</u> and the American Law Institute's adoption of the Restatement (Third) of Torts, neither of which adopted the "foreseeability approach."   In particular, critics of the "foreseeability approach" have suggested that it goes too far in restricting tort recovery for damage to "other property," particularly given what may be deemed to be foreseeable with the benefit of hindsight, and that it takes away important incentives for manufacturers to continue to make safe products.   <u>See</u>, <u>e.g.</u>, <u>Grams v. Milk Products, Inc.</u>, 2005 WI 112, ¶¶ 57-94, 699 N.W.2d 167 (Abrahamson, C.J. dissenting).

More recently, the Wisconsin Supreme Court adopted a similar, but possibly narrower, position, which it referred to as the "disappointed expectations" test. <u>Id.</u> at ¶¶ 41-55.  In <u>Foremost Farms USA Cooperative v. Performance Process, Inc.</u>, 2006 WI App. 246, 727 N.W.2d 289 (Wis. Ct. App.), the Wisconsin Court of Appeals summarized the application of this test as follows:

> As stated above, determining whether damage qualifies as damage to "other property" under the "disappointed expectations" test turns on whether the purchaser should have anticipated the need to seek protection against loss through contract. The test focuses on the expected function of the product and whether, from the purchaser's perspective, it was reasonably foreseeable that the product could cause the damage at issue. The test asks whether a reasonable purchaser in the plaintiff's position should have foreseen the risk. Foreseeable interaction between damaged property and the damage-causing product is insufficient, by itself, to meet the "disappointed expectations" test.

<u>Id.</u> at ¶ 35.  The Wisconsin courts apply the "disappointed expectations" test only when there is still an issue of whether there should be tort recovery after applying its "integrated product" test.  <u>Id.</u> at ¶ 25.

### 3.      The position taken by the Restatement (Third) of Torts

In 1998, the American Law Institute adopted Restatement (Third) of Torts:  Products Liability § 21.  In § 21, the Institute followed East River's and Saratoga Fishing's "product/other property" and rejected, albeit without much discussion, the more expansive approaches discussed above.  Id. at cmt. d.  The Institute, however, did leave open the issue of whether a party can contractually disclaim or limit its liability for damage to "other property."  Id. at cmt. f.[2]   The distinction between this and the more expansive approaches taken by the Michigan and Wisconsin courts is  that it requires that the subject of liability for damage to other property be addressed in the purchase contract, as opposed to the latter which merely requires that the damage be foreseeable in some fashion such that the issue of liability could have been addressed.

### 4.      The North Dakota Supreme Court cases

The North Dakota Supreme Court first addressed the economic loss doctrine in the context of a products liability case in Hagert v. Hatton Commodities, 350 N.W.2d 591, 595 (N.D. 1984), which was prior to the Supreme Court's decision in East River.   In Hagert, the plaintiff purchased certified pinto bean seeds from the defendant and planted them in two plots.  It turned out that the seeds were contaminated, resulting in the bean plants becoming infected with disease.  Upon expert

---

[2]  The Institute stated:

*f. Harm to other property: disclaimers and limitations of remedies.* Although recovery for harm to property other than the defective product itself is governed by this Restatement, the Institute leaves to developing case law the questions of whether and under what circumstances contracting parties may disclaim or limit remedies for harm to other property. Of course, such contractual limitations would be effective only between the parties themselves. When a defective product causes harm to property owned by third persons, the contractual arrangements between the contracting parties should not shield the seller from liability to the third party. However, contractual limitations on tort liability for harm to property, when fairly bargained for, may provide an effective way for the contracting parties efficiently to allocate risks of such harm between themselves.

advice, the plaintiff destroyed the plants and reseeded, which resulted in a delayed growing season and a reduction in anticipated yields.  Id. at 592.

The trial court in Hagert submitted the case to the jury based upon claims of breach of warranty and strict liability in tort, and the plaintiff prevailed. The issue on appeal was whether the plaintiff should have been entitled to a new trial because of alleged errors in the jury instructions. The Supreme Court agreed that the economic loss doctrine prevented recovery in strict liability in tort for lost profits.  Id. at 595.  Without significant discussion, the supreme court appeared to be of the view, however, that the strict liability claim for the damage to the crops could proceed because this claim was sent back for trial along with instructions to the trial court that it must include "unreasonable dangerousness" as one of the elements of the strict liability claim.  Id.  Also, the court stated:

> The instant case affords us the first opportunity to consider whether economic loss in a defective product case may be recovered under a theory of strict liability in tort. We conclude that economic loss, *as distinguished from injury to property*, may be recovered under express or implied warranty under the Uniform Commercial Code but not under § 402A, strict liability in tort. The jury was improperly instructed in the special verdict form which permitted an improper recovery and a new trial is required.

Id. (emphasis added).

The North Dakota Supreme Court next addressed the economic loss doctrine in Cooperative Power Association v. Westinghouse Electric Corp., 493 N.W.2d 661, 665 (N.D. 1992).  In that case, the North Dakota Supreme Court was asked to consider questions certified by  this court involving the failure of a component part of an electric transformer that damaged only the transformer. Relying primarily upon the rationale expressed by the Supreme Court in East River, the North Dakota Supreme Court answered the primary question as follows:

We adopt the rationale of East River and conclude that a manufacturer of a machine sold in a commercial transaction may not be held liable in negligence or strict liability for economic loss caused by a failure of a component part of the machine which causes damage to the machine only.

Id. at 667.  In reaching this conclusion, the North Dakota Supreme Court expressly rejected the "minority" and "intermediate" positions discussed in East River.  And, while the court did not have to address whether tort recovery would be permitted for economic loss to "other property," the court did state the following:

CPA nevertheless argues that a "risk of harm" analysis is applicable to commercial transactions because that analysis provides manufacturers with incentive to produce safe products. CPA asserts that it is only through fortuitous circumstances that this defective product did not damage other property or people in the area. *Although society has a strong interest in safe products, the rules of negligence and strict liability for damage to property other than the product itself and for personal injury adequately protect that interest and provide manufacturers with incentive to produce safe products.*

Id. at 665 (emphasis added).

The next decision by the North Dakota Supreme Court of note is that of Clarys v. Ford Motor Co., 1999 ND 72, 592 N.W.2d 573.  In Clarys, the plaintiff sought to recover in tort for the loss of a used van that was destroyed by a fire caused by a defective ignition switch.  The issue there was whether the court should extend the economic loss doctrine, which it had previously applied in the commercial context in Cooperative Power, to a consumer transaction involving a defective product. The court concluded it should, relying upon the reasoning employed by the Supreme Court in East River, which the court held was applicable regardless of whether the purchaser was a consumer or a commercial party, and also upon the Restatement (Third) Torts: Products Liability § 21, which the court noted did not distinguish between commercial and consumer transactions.  Id. at ¶¶ 12-19.

As in Cooperative Power, there was no issue in Clarys regarding recovery in tort for damage to "other property."  However, in *dicta*, the court again noted the distinction between damage to the product and damage to "other property" and stated that tort recovery for damage to "other property" is permitted under North Dakota law based upon public policy considerations.  After discussing the position taken by the Restatement (Third) of Torts, the court stated;

> This recent Restatement enactment supports our decision to apply the economic loss doctrine to all plaintiffs, including nonbusiness consumers. *We agree with the Restatement drafters that the Uniform Commercial Code, not product liability tort law, governs actions of persons seeking redress for damages when the injury is confined to the defective product itself, and neither persons nor other property are damaged.*
>
> [¶ 19] The economic loss doctrine recognizes the distinction between the bargain expectation interests protected by contract law under the Uniform Commercial Code and the safety interests protected by tort law. The distinction applies to consumer, as well as commercial, purchasers. *When a defective product causes damage to persons or other property, the interest at stake is health and safety, irrespective of whether the initial purchase was a consumer or commercial transaction. Those safety interests are protected under tort law, which allows recovery by injured plaintiffs against a seller or manufacturer of an unreasonably dangerous defective product. N.D.C.C. ch. 28-01.3. When, however, a product is defective and damages only itself, the interest at stake is the purchaser's expectation of receiving the bargained-for product.* That interest is protected by the remedies provided under Article 2 of the Uniform Commercial Code, N.D.C.C. ch. 41-02. The Code provides a vast array of remedies, including recovery of consequential damages, when a product fails to meet consumer expectations. See N.D.C.C. § 41-02-94 (incidental and consequential damages recoverable from breaching seller).

Id. at ¶¶ 18-19 (emphasis added).

### C.   Application of the Eighth Circuit's decision in Dakota Gasification

In Dakota Gasification, the predecessor to the current owner of a large coal-gasification plant contracted for the construction of an oxygen plant, a discrete part of the larger gasification plant that was to be housed in a separate steel building.  After the erection of the structural steel for the building, which was supplied by the defendant who was a lower tier subcontractor, a number of

defective welds were discovered.  The welds were repaired to the satisfaction of the current owner's predecessor and the building was accepted.   Eight years later, however, the roof of the building collapsed causing damage to the metal building and various items within the oxygen plant.  91 F.3d at 1096-1097.

The current owner of the coal-gasification plant then sued the defendant in this court seeking to recover in tort for the losses sustained to the oxygen plant.   Upon summary judgment, this court concluded that the entire oxygen plant, and not the structural steel of the metal building, was the "product" for purposes of application of economic loss doctrine; hence, there could be no tort recovery since the only claimed damage was to the product itself.   Alternatively, the court also concluded that, even if there were disputed facts as to what constituted the product,  North Dakota would follow the expansive approach to the economic loss doctrine taken by the Michigan courts.  And, applying this approach, the court concluded that there could be no tort recovery because the damage to the oxygen plant and steel building was foreseeable and well within the contemplation of the parties.  Id. at 1097-1099.

On appeal, the Eighth Circuit affirmed on the basis of this court's alternative holding.  After discussing the "foreseeability approach" taken by the Michigan courts, the Eighth Circuit concluded:

> We therefore agree with the district court's prediction that the North Dakota Supreme Court would adopt the modern trend, and conclude that the economic loss doctrine extends to preclude liability in tort for physical damage to other nearby property of commercial purchasers who could foresee such risks at the time of purchase.

Id. at 1101.

Subsequent developments, however, create a substantial question as to the continuing viability of this prediction.  Since Dakota Gasification, the Supreme Court decided Saratoga Fishing

and the Institute adopted Restatement (Third) of Torts § 21, neither of which adopted the expansive approach taken in <u>Dakota Gasification</u>.  And, perhaps, more importantly, the North Dakota Supreme Court has continued to embrace the balance struck in <u>East River</u> between tort and contract interests that underlies the "product/other property" dichotomy and has continued to suggest, albeit in *dicta,* that tort recovery would be permitted for property other than the product itself.  <u>Clarys</u>, 1999 ND 72 at ¶¶ 18-19.  Further, while the court has not once cited to <u>Dakota Gasification</u>, it has cited with approval Restatement (Third) of Torts § 21, albeit for a different purpose.  <u>Id.</u> at ¶ 18.

If this was a question of first impression, the court's obligation would be to consider "relevant state precedent, analogous decisions, considered dicta, scholarly works and any other reliable data" in predicting what the North Dakota Supreme Court would do.  <u>See</u>  <u>Farr v. Farm Bureau Ins. Co. of Nebraska</u>, 61 F.3d 677, 679 (8th Cir. 1995).  Confronted with almost the same situation in terms of predicting what the Pennsylvania Supreme Court would do in light of  <u>Saratoga Fishing</u>, the Third Circuit overruled a Pennsylvania federal district court decision that had applied a more expansive approach to the economic loss doctrine, stating:

> We are aware that a number of courts in addition to the district court we are reviewing have ruled that the economic loss doctrine bars tort recovery where the "other property" damaged was always likely to have been injured upon the failure of "the product" itself. <u>See</u>, <u>e.g.</u>, <u>Dakota Gasification Co. v. Pascoe Bldg. Systems</u>, 91 F.3d 1094, 1099 (8th Cir.1996) (applying North Dakota law); <u>Detroit Edison Co. v. NABCO, Inc.</u>, 35 F.3d 236 (6th Cir.1994)(applying Michigan law); <u>Wellsboro Hotel Co. v. Prins</u>, 894 F.Supp. 170 (M.D.Pa.1995)(applying Pennsylvania law); <u>Hartford Fire Ins. Co. v. Huls America, Inc.</u>, 893 F.Supp. 465, 469 (E.D.Pa.1995)(applying Pennsylvania law); <u>Neibarger v. Universal Cooperatives, Inc.</u>, 439 Mich. 512, 486 N.W.2d 612 (1992)(applying Michigan law). However, it is also true that numerous courts have rejected this expansion of the economic loss doctrine. <u>See</u>, <u>e.g.</u>, <u>Saratoga Fishing Co. v. Marco Seattle Inc.</u>, 69 F.3d 1432, 1445 (9th Cir.1995), <u>aff'd on other grounds</u>, 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997); <u>Alliance Imaging, Inc. v. Picker Int'l Inc.</u>, 1993 WL 76209 (E.D.Pa.1993); <u>Jet Plastica Industries, Inc. v. Goodson Polymers, Inc.</u>, 1992 WL 17207 (E.D.Pa.1992). We find the latter cases more persuasive, and, particularly after

> Saratoga Fishing, we are confident that the Pennsylvania Supreme Court would not
> conclude that the economic loss doctrine precludes recovery for damage to the
> contents of a warehouse when the warehouse collapses.

2-J Corp. v. Tice, 126 F.3d 539, 544 n.4 (3d Cir. 1997); see also Corsica Cooperative Association
v. Behlen Manufacturing Company, Inc., 967 F. Supp. 382, 385-387 (D.S.D. 1997) (declining to
adopt the "foreseeability approach" because of the South Dakota Supreme Court's prior reference
to tort liability for "other property").

This, however, is not a matter of first impression, and the court is obligated to follow the
Eighth Circuit's prediction of North Dakota law unless a subsequent state court decision or a
statutory amendment has rendered the prediction clearly wrong.  Reiser v. Residential Funding
Corp., 380 F.3d 1027, 1029 (7th Cir. 2004); Batts v. Tow-Motor Forklift Co., 66 F.3d 743, 747 (5th
Cir. 1995); cf. AIG Centennial Ins. Co. v. Fraley-Landers, 450 F.3d 761, 767 -768 (8th Cir. 2006).

In this case, while there may be a substantial question with respect to the continued viability
of Dakota Gasification's prediction, it cannot be said it is clearly wrong.  The North Dakota
Supreme Court has not squarely addressed the issue and its most recent statements in Clarys, that
tort recovery is permitted for damage to property other than the product itself, are *dicta*. Further,
Dakota Gasification's "foreseeability  approach" does not foreclose tort recovery for damage to all
"other property" - only damage that could have been foreseen and made the subject of the purchase
negotiations.  As such, it is only an incremental step beyond what the North Dakota Supreme Court
has suggested in broad terms is the law, and it is a step that several courts have taken as indicated
by the prior discussions, including most recently the Wisconsin courts.  Thus, it is possible that the

North Dakota Supreme Court might follow <u>Dakota Gasification</u>, or a similar variant of the "foreseeability approach,"when directly presented with the question.[3]

Applying <u>Dakota Gasification's</u> "foreseeability approach" to this case, the court concludes that the damage to the header and the loss of the combine's gasoline were clearly foreseeable in the event of a loss such as occurred in this case and something that could have been addressed at the time of the combine's purchase.  Consequently, Albers's tort claims must be dismissed for this reason.

Nevertheless, because of the possibility of an appeal and the closeness of the issue as to whether <u>Dakota Gasification</u> is still good law, the court will proceed to address the application of the economic loss rule in the context of the "property/other property" dichotomy.

**D.    Application of the "product/ other property" dichotomy**

      **1.    The arguments of the parties**

Albers contends that the header and the fuel onboard the combine were "other property." With respect to the header, Albers emphasizes the following facts in support of its argument:

- combines and headers are traditionally sold separately;

- different headers are used for different types of crops;

---

[3] Another possibility is that the North Dakota Supreme Court could conclude that the Eighth Circuit's decision in <u>Dakota Gasification</u> is distinguishable on its facts and that the result would have been the same without applying the "foreseeability approach."  First, as already noted, this court's decision in <u>Dakota Gasification</u> was premised primarily upon the conclusion that the oxygen plant was an integrated product and the prediction that the North Dakota Supreme Court would adopt a "foreseeability approach" was an alternative holding.  Second, the Eighth Circuit concluded that there had been actual bargaining over the scope of liability for consequential loss that clearly included damage to the "other property" which was at issue.  91 F.3d at 100.  As noted earlier, comment f to Restatement (Third) of Torts § 21 left open the issue of when and to what extent a party can contractually disclaim its tort liability for damage to "other property."  The North Dakota Supreme Court might conclude, for example, that commercial parties of equal bargaining power, such as was the case in <u>Dakota Gasification</u>, should be able to bargain over the scope of such liability.  In this case, while Deere effectively disclaimed its warranty liability, it is not clear it did so with respect to tort liability for damage to other property.

- a header made by one manufacturer can sometimes be used on a combine from another manufacturer;

- the combine and header in this case were manufactured in different years and were both used pieces of equipment; and

- the combine and header in this case, even though purchased at the same time, were listed as two different products on the purchase order, each with its own pricing.

Deere does not seriously disputes these facts other than to question at oral argument the degree of interchangeability of headers and combines manufactured by different manufacturers. In any event, the court assumes these facts to be true for purposes of Deere's motion.

Deere's position is that the combine and header constituted one integrated product for which no tort recovery is permitted, emphasizing the following facts that also appear to be undisputed:

- the header and combine in this case were sold at the same time;

- the header and combine were attached at the time of the loss;

- the header and combine, when attached, work together as an integrated piece of equipment; and

- the combine needs a header of some sort for the combine to be practically functional.

Since the North Dakota Supreme Court has yet to clearly articulate an approach to deciding what is the "product" and what is "other property," the parties have both referenced cases from other jurisdictions, one of which is the Supreme Court's decision in <u>Saratoga Fishing</u>. Because of the prominence of <u>Saratoga Fishing</u> and the fact that it introduces its own unique twist, it makes sense to begin there before turning to some of the relevant authority from other jurisdictions.

2.      **Saratoga Fishing**

In Saratoga Fishing, the owner of a fishing vessel brought an admiralty tort action against the manufacturer of the vessel as well as the designer of the vessel's hydraulic system, claiming that the hydraulic system was defectively designed and caused the vessel to catch fire and sink.  The owner, who is referred to by the Court as the "Subsequent User," purchased the vessel from the "Initial User," who, in turn, had purchased the vessel from the manufacturer.  520 U.S. at 878-879.

The issue in Saratoga Fishing was whether certain equipment added by the Initial User after its purchase from the manufacturer to outfit the vessel for tuna fishing was "other property," so that the loss of the added equipment could be recovered in tort.  The equipment that was added included a skiff, a seine net, and various spare parts.  Id. at 879.

The Court held that the added equipment was "other property," overruling the Ninth Circuit's decision to the contrary.  The Court stated:

> We conclude that equipment added to a product after the Manufacturer (or distributor selling in the initial distribution chain) has sold the product to an Initial User is not part of the product that itself caused physical harm.  Rather, in East River's language, it is "other property." (We are speaking, of course, of added equipment that itself played no causal role in the accident that caused the physical harm.) Thus the extra skiff, nets, spare parts, and miscellaneous equipment at issue here, added to the ship by a user after an initial sale to that Initial User, are not part of the product (the original ship with the defective hydraulic system) that itself caused the harm.

Id. at 884-885.

In reaching this decision, the court noted its earlier observation in East River that even the simplest of machines have component parts, and that drawing the line between the product and "other property" at the component part level would allow tort recovery in most cases and eliminate the distinction between warranty and tort in cases involving only damage to the product.  The court

18

stated it was not retreating from this observation but that case law supported drawing a distinction between the components added to a product by a manufacturer before the product's sale to a user and those items added by a user after the sale, and that the policy reasons expressed in those cases supported drawing the line between the "product" and "other property" when the product is first introduced into the stream-of-commerce.  Id. at 883-884.

If the determination as to what constitutes the "product" should be made when it is first introduced into the stream-of-commerce as suggested by Saratoga Fishing, then the argument could be made that what the court should look to in this case is what the configuration of the combine was when it was first sold by Deere, or one of Deere's dealers, and not when it was resold to Albers as a used product by Jamestown Implement.  The only evidence before the court as to what the combine's configuration was when it was first introduced into the stream-of-commerce is the assertion by Albers in his affidavit that combines and headers are typically sold separately, which the court will presume to be true for purposes of ruling on Deere's motion.  And, if it is true, then Albers has an argument under Saratoga Fishing that the header should be considered "other property."

There is one significant difference between Saratoga Fishing and this case, however, and that has to do with the fact that the resale in this case was by a commercial reseller.  In fact, Jamestown Implement was a Deere dealer and the purchase contract was Deere's form containing Deere's standard terms for new and used equipment.  While the court believes this difference to be significant as discussed later, it is not without some doubt.  The broadest reading of Saratoga Fishing suggests that equipment added to a product after it has been introduced into the stream-of-commerce to an "Initial User" should not change the manufacturer's liability and incentives to produce safe

19

products just because equipment has been added by a commercial reseller.  In his dissent, Justice Scalia read the majority decision the same way and argued that it rejected what would have been a more preferable rule, which he referred to as a "last-402A-seller rule," pursuant to which "the 'product' would be fixed when it is sold by the last person in the chain of distribution who is, in the words of § 402A of the Restatement Second of Torts (1964), 'engaged in the business of selling a product.'"  520 U.S. at 886-890 (Scalia, J., dissenting).

> **3.    Other cases applying the "product/other property" dichotomy**

What distinguishes the "product/other property" dichotomy from the more expansive "foreseeability" and "disappointed purchaser" approaches is that the focus for determining the scope of the tort liability is upon defining the product (with all other property then being defined as "other property") rather than upon the foreseeability of the damage.  Unfortunately, in the many jurisdictions that continue to use the "product/other product" dichotomy, there is no consensus over an approach to deciding what constitutes the "product," with the courts sometimes reaching different results in factually similar cases.

At the risk of oversimplification, there appears to be at least three different  approaches that have been taken to define the "product" by courts that continue to recognize the "property/other property" dichotomy.   The differences between the approaches are to some degree a matter of emphasis, with some courts employing more than one approach to grapple with differences in the kinds of products.

> **a.    Cases focusing upon the "object-of-the-bargain"**

Most of the courts that apply the "product/other property" dichotomy define the product by focusing upon what was the "object-of-the-bargain" consistent with  limiting tort remedies when the

parties have had the opportunity to contractually address the scope of liability.  Under this approach, if a component part causes damage to the product bargained for, then, in most jurisdictions, the remaining parts of the purchased product would not be considered "other property."  On the other hand, items purchased and bargained for separately from the "product" would more likely be considered "other property."

As noted above, the Supreme Court in <u>Saratoga Fishing</u> took an "object-of-the-bargain" approach.  It is also the approach that would be taken if a court applied what Justice Scalia in his dissent in <u>Saratoga Fishing</u> referred to as a "last-402A-seller" rule.  The principal difference between the majority's approach in <u>Saratoga Fishing</u> and a "last-402A-seller" rule is that the "object-of-the-bargain" is determined when the product is first introduced into the stream-of-commerce and sold to an "Initial User," while, under the latter, it would be made as of the last sale by a Restatement Rule 402A seller.

A recent case applying state law that adopts a variation of the "object-of-the-bargain" approach is the Indiana Supreme Court's decision in <u>Gunkel v. Renovations, Inc.</u>, 822 N.E.2d 150 (Ind. 2005).  In that case, the plaintiff contracted for the construction of a three-story residence with one contractor and separately for the installation of a stone and masonry exterior with another.  The stone facade leaked causing damage to both the building structure and the stone facade.  The Indiana Supreme Court canvassed the differing approaches taken in other jurisdictions to defining the "product" and concluded that the court should look to what the plaintiff actually purchased to define the "product."[4]  And, since the plaintiff in that case had bargained for the stone facade separately

---

[4]  The court noted the Supreme Court's decision in <u>Saratoga Fishing</u> and stated it would leave for another day whether it would look to an earlier purchase to define the product in a case in which there had been a resale of the product.   822 N.E.2d at156 n.8.

21

from the structure of the house, the court held the house to be "other property" for which there could

be tort recovery.   Id. at 153-156.  The court stated the following:

> We think that the theory supporting the economic loss doctrine supplies the answer to whether damage to "other property" is involved. Only the supplier furnishing the defective property or service is in a position to bargain with the purchaser for allocation of the risk that the product or service will not perform as expected. If a component is sold to the first user as a part of the finished product, the consequences of its failure are fully within the rationale of the economic loss doctrine. It therefore is not "other property." But property acquired separately from the defective good or service is "other property," whether or not it is, or is intended to be, incorporated into the same physical object. Although we express our reasoning slightly differently, we align ourselves with the courts that have concluded that the "product" is the product purchased by the plaintiff, not the product furnished by the defendant. The cases that have used this formulation have typically involved claims by a first user of a finished product that includes a component supplied by the defendant where the purchaser had no dealings with the defendant.  A frequently cited example is King v. Hilton-Davis, 855 F.2d 1047 (3d Cir.1988), where a farmer sued the manufacturer of a chemical used to treat the seed potatoes that the farmer purchased from a supplier. The Third Circuit applied Pennsylvania law but followed the United States Supreme Court's reasoning in East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), finding that there was no reason to give purchasers a broader tort remedy against the remote supplier than the purchaser could assert against the manufacturer of the assembled defective product. Id. at 1051. Similarly, a purchaser of a complete aircraft is remitted to warranty remedies and has no tort remedy against a component supplier even if the entire aircraft is damaged by a defective component. Airlift Int'l, Inc. v. McDonnell Douglas Corp., 685 F.2d 267 (9th Cir.1982) (California law).
>
> Here we have the obverse situation. The Gunkels did deal directly with J & N. The same formulation of the demarcation between contract and tort remedies is controlling--property acquired by the plaintiff separately from the defective goods or services is "other property" whose damage is recoverable in tort. That formulation excludes from "other property" other parts of a finished product damaged by components supplied to the seller by other manufactures and imported into the seller's product. But it does make property acquired separately "other property" for purposes of the economic loss rule even if the defective product is to be incorporated into a completed product for use or resale.

Id. at 156-157 (footnote omitted).  Another case reaching a similar result is McFadden v. Dryvit

Systems, Inc., 2004 WL 2278542 (D. Ore. 2004), in which a federal district court applying Oregon

law concluded that damage caused to an existing building by the installation of defective siding was

recoverable in tort because the existing building was "other property."  But, as noted later, some courts have reached the opposite conclusion to the extent that the product is viewed as a replacement for a component part originally bargained for or is considered to be part of a larger, integrated item.

One of the principal cases relied upon by Deere for its argument that the combine and header in this case constituted one product is Trans States Airlines v. Pratt & Whitney Canada, Inc., 682 N.E.2d 45 (Ill. 1997).  In that case, the Illinois Supreme Court addressed three questions certified to it by the Seventh Circuit in a case where a defect in an aircraft engine caused damage to both the engine and the airframe of an aircraft.  The facts were that the defendant engine maker supplied jet engines to an aircraft manufacturer, who, in turn, sold an aircraft with the engines attached, including the defective one, to a finance corporation.  The aircraft was then leased to another entity, which subleased the aircraft to the plaintiff airline.  Accompanying the aircraft were separate warranties from the engine manufacturer.  Id. at 46.

The Illinois Supreme Court concluded in Trans States Airlines that it should follow East River and apply an "object-of-the-bargain" approach.  And, in applying that approach, the court concluded that the product bargained for was the entire aircraft, including the accompanying engines; hence, the airframe was not "other property."  Id. at 52-58.

In this case, Deere argues that the combine and header were one integrated product for the same reasons that the aircraft engines and airframe were held to be one integrated product in Trans States Airlines.  What Deere glosses over, however, is how the Illinois Supreme Court applied the "object of the bargain approach" to the facts in that case and how those facts might differ from the present case.

To determine the "object of the bargain" in <u>Trans States Airlines</u>, the court looked to the sublease, which specifically defined the product aircraft to include both the airframe and the engines. Based on this definition, the court concluded that the product bargained for was the aircraft including the engines, even though the engines were manufactured by a different manufacturer, had their own log books, and were accompanied by their own warranty.  <u>Id.</u> at 58-59.  The court stated the following:

> Under the terms of the sublease agreement, plaintiff bargained for and received a fully integrated aircraft.  *Plaintiff did not bargain separately for an engine and separately for an airframe.  Had plaintiff done so, then damage to the airframe by the engine could be perceived as damage to "other property."*

<u>Id.</u> at 59 (emphasis added).  And, consistent with this emphasized language, the Illinois Supreme Court responded yes to one of the certified questions, which was: "Can a product and one of its component parts ever constitute two separate products?"  <u>Id.</u> at 59.

 <u>American Eagle Ins. Co. v. United Technologies Corp.</u>, 43 F.3d 142 (5th Cir. 1995) is another case involving damage to an airframe caused by an aircraft engine.  Applying Texas law, the Fifth Circuit came to the same result as the Illinois Supreme Court in <u>Trans State Airlines</u>, but only after concluding that the engines were attached to the aircraft at the time of purchase and because the plaintiff failed to offer any "evidence that the parties bargained separately for individual components of the aircraft."  <u>Id.</u> at 145.

Another case of interest illustrating the "object-of-the-bargain" approach is <u>Hutton v. Deere & Co.</u>, 2000 WL 350260, 210 F.3d 389 (Table) (10th Cir. 2000) (unpublished disposition), which involved a loss to a "delimber," a piece of commercial logging equipment that, when attached to a piece of motorized-carrying equipment, removed limbs from felled trees and cut the trees to certain specifications.  The plaintiff in <u>Hutton</u> had arranged for a retail seller of construction equipment and

24

an authorized Deere dealer to put together a delimber for it.  To do so, the retail seller acquired a delimber from a Canadian manufacturer and mounted it on a Deere excavator, which required some modifications to the excavator.  Sometime after the sale, a fire originating within the excavator destroyed both the excavator and the delimber.

One of the issues in Hutton was whether the delimber was a separate product such that it constituted "other property."   Relying upon East River and Saratoga Fishing, the court concluded that only one product had been bargained for, stating the following:

> We agree with the district court that, under Saratoga Fishing, the product which Hutton bargained for, and the product which was placed in the stream of commerce by the manufacturers and the distributor, was the fully converted delimber machine. Hutton negotiated and purchased the equipment as a single item with a single price. The final sales quote, dated July 19, 1995, identifies the sale item as "One (1) New John Deere 690E Carrier ... assembled complete with a Pro-Pac Model PP-453 Delimber."

Id. at *3.  Further, the court went on to conclude that Saratoga Fishing was not inapposite since the sale to the plaintiff was the first sale to an initial user.  Id. at *4.

In an almost identical case, a Minnesota federal district court reached the same conclusion in Milwaukee Mutual Insurance Co. v. Deere & Co., Inc., 2005 WL 2105513 (D. Minn. 2005), which involved a fire originating within a Deere excavator that damaged both the excavator and an attached "tree processor." The court concluded the tree processor was a component part and not "other property," stating:

> Here, the tree processor was attached to the Excavator and installed before the owner bought both items, which work as a single unit and were sold as a single unit, in one transaction, for one undivided price.

Id. at *4.

In this case, Albers points to the fact that the combine and header were identified on the purchase order as separate products with their own individual prices as evidence that they were

bargained for separately and, hence, were separate products.  In the alternative, Albers argues that, at the very least, this presents a fact issue that must be resolved by the jury.  The court will return to these argument later, but note they do present a close question whether the header in this case should be considered "other property."

> **b.**     **Cases allowing recovery for some "component-to-component" damage**

Generally speaking, that courts that follow an "object-of-the-bargain" approach more strictly limit tort recovery for damage caused by component parts when the larger integrated product is the "object-of-the-bargain."  A few courts, however, apply more relaxed rules that permit tort recovery for damage caused by component parts to other parts of an integrated product in some cases.  As noted by Albers in his brief, California is one of these jurisdictions.

In <u>Jimenez v. Superior Court</u>, 58 P.3d 473 (Cal. 2002), the California Supreme Court held that the economic loss rule did not preclude a manufacturer of windows installed in a mass-produced home from being held liable in tort for damage to other parts of the home.  Based on that decision, the California Court of Appeals in <u>KB Home v. Superior Court</u>, 112 Cal. App. 4th 1076 (Ct. App. 2d Dist. 2003) stated the following with respect to when tort recovery would be permitted for component-to-component damage:

> Under the rationale for the economic loss rule originally articulated in <u>Seely</u>, as refined by the Supreme Court's analysis in <u>Jimenez</u>, we believe distinguishing between "other property" and the defective product itself in a case involving component-to-component damage *requires a determination whether the defective part is a sufficiently discrete element of the larger product that it is not reasonable to expect its failure invariably to damage other portions of the finished product.* If that is the case, permitting tort recovery when the defective part causes physical injury to other components is consistent with the underlying principle recognizing a manufacturer's liability in tort "by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm." ( <u>Seely</u>, <u>supra</u>, 63 Cal.2d at p. 18, 45 Cal.Rptr. 17, 403 P.2d 145.) If not, it is fair to impose upon the

> consumer (in this case, KB Home) "the risk that the product will not match his economic expectations unless the manufacturer agrees that it will" ( *ibid.*), and thus to limit damages to those recoverable under the law of contractual warranty. (Jimenez, supra, 29 Cal.4th at p. 483, 127 Cal.Rptr.2d 614, 58 P.3d 450.)

Id. at 1087 (emphasis added).   The Court of Appeals then went on to conclude that a number of factors must be considered in making this determination and that, ordinarily, it presents a question of fact for the jury.   Id. at 1086-1087.   The factors that the Court of Appeals stated should be considered are set forth in a California pattern jury instruction developed after KB Home, which reads, in pertinent part, as follows:

> In making this determination, you should consider all of the evidence, and the following questions:
> A.   Does the defective component perform an integral function in the operation of the larger product?
> B.  Does the component have any independent use to the consumer, that is, some use other than as incorporated into the larger product?
> C. How related is the property damage to the inherent nature of the defect in the component?
> D.  Was the component itself or the larger product placed into the stream of commerce (or, viewed from the buyer's perspective, was the larger integrated product or the component itself the item purchased by the plaintiff)?
> The weight to be given to the answer to any of these questions is for you to decide.

Cal. Civ. Jury Instructions (BAJI) 9.02(2004); see id.

Albers also cites to County of Westchester v. General Motors Corp., 555 F. Supp. 290 (S.D.N.Y. 1983).   In that case, the plaintiff claimed that defectively-designed air-conditioning systems in buses sold by GM caused the systems to fail, resulting in substantial damage to the air-conditioning condensers.   After reviewing New York cases applying the economic loss doctrine, the federal district court concluded that tort recovery would be permitted for damage caused by a defective product to itself if the damage was "unrelated to the inherent nature of the alleged defect." Id. at 292.   In applying that test, the court concluded that the condenser was a primary component

of the defectively designed air-conditioning system and that the economic loss doctrine barred recovery.  While the court did not further articulate the basis for this conclusion, presumably it was because the damage to the condensers was related to the nature of the alleged design defect.  Id. at 292-293.

Based on the line of cases that allow tort recovery for component-to-component damage, Albers argues he is entitled to recovery, even if the header and the combine are considered one product.

> **c.    Cases denying recovery for damage caused to an "integrated product" regardless of what was the original "object-of-the-bargain"**

Courts in some cases have denied tort recovery for damage to separately purchased components or other property relying entirely, or sometimes alternatively, upon the fact that the components or other property became part of an integrated product, regardless of what was the "object-of-the-bargain."  See, e.g., Rockport Pharmacy, Inc. v. Digital Simplistics, Inc., 53 F.3d 195 (8th Cir. 1995) (no recovery for lost data on a computer system); Higginbotham v. Dryvit Systems, Inc., 2003 WL 1528483, *5-6 (E.D.N.C. 2002) (no recovery for damage to remainder of house caused by a separately installed defective siding system when plaintiff was acting as his own general contractor); Exxon Shipping Co. v. Pacific Resources, Inc., 835 F. Supp. 1195, 1201 & n.5 (D. Haw.1993) (no recovery for separately purchased hoses added to single-point mooring system).

Similarly, courts have also split on whether there can be tort recovery for damage to a product caused by separately purchased replacement parts, with the outcome in some cases depending upon whether the replacement parts were purchased from a third party or whether they were purchased from the product's manufacturer.  Compare  Sea-Land Service, Inc. v. General

28

Electric Co., 134 F.3d 149, 153 (3d Cir. 1998) ( not tort recovery for replacement parts that become part of the product, but stating there could be tort recovery for additional equipment); Sebago, Inc. v. Beazer East, Inc., 18 F. Supp. 2d 70, 92 (D. Mass.1998) (no tort recovery for damage to an existing building caused by replacement roofing that proved to be defective); with Indemnity Ins. Co. of North America v. American Eurocopter, LLC, 2005 WL 1610653 (M.D.N.C. 2005) (allowing tort recovery for the loss of a helicopter caused by a rebuilt gearbox purchased from an American affiliate of the French manufacturer of the helicopter since the American affiliate was a separate company); Mountain West Helicopter, LLC v. Kaman Aerospace Corp., 310 F. Supp. 2d 459, 466 (D. Conn. 2004) (tort recovery allowed for damage to a helicopter caused by a defective clutch assembly that waw replaced at the urging of the manufacturer); Transco Syndicate # 1, Ltd. v. Bollinger Shipyards, Inc., 1 F. Supp. 2d 608, 612 (E.D. La. 1998) (allowing tort recovery for damage to a ship caused by a refurbished engine since the refurbisher was not the seller of the ship).

### 4.   Applying the "product/other property" dichotomy in this case

#### a.   The header

If the North Dakota Supreme Court ultimately rejects the more expansive approaches to application of the economic loss doctrine and applies the "product/other property" dichotomy, it is most likely to adopt some variation of an "object-of-the-bargain" approach to deciding what is the "product" and what is "other property."   This is because the "object-of-the-bargain" approach is most consistent with the court's decision in Cooperative Power to deny tort recovery for damage caused by a component part to a larger product.  Also, it is the approach that is the most consistent

with the court's embrace of  East River's balancing of the tort and contract interests, as discussed earlier.

In applying an "object-of-the-bargain" approach in this case, the North Dakota Supreme Court would mostly likely look to what Albers purchased from Jamestown Implement to define the "product," even though this was not the first time the combine and header were introduced into the stream-of-commerce by the manufacturer.  In other words, the North Dakota Supreme Court would likely not apply the broad reading of Saratoga Fishing urged by Albers.

For reasons alluded to earlier, Saratoga Fishing is distinguishable.  Unlike the resale in Saratoga Fishing, the resale to Albers was made by the manufacturer's dealer and was made pursuant to the manufacturer's standard terms.  In essence, it was a "reintroduction" of the combine and header into the "stream-of-commerce" with Albers, a commercial purchaser, having at least the theoretical ability to negotiate the terms of any warranty with the manufacturer's dealer, just as if the product was being purchased for the first time.  Moreover, even if Saratoga Fishing is not distinguishable, the court predicts the North Dakota Supreme Court would favor some other approach to defining the product in this instance, including possibly the "last-402A-seller" approach suggested by the dissent.

Having concluded that the determination of the "product" must be made by looking to what Albers purchased from Jamestown Implement, the court must next address Albers's argument that the purchase order's separate listing of the header with its own price creates a fact issue as to what was the "object-of-the-bargain."  While a purchaser's negotiation of a separate price might be a *material* issue of fact in other circumstances, the court concludes it not here given: (1) the fact that a combine is of limited functionality without some type of header; (2) the header was sold at the

30

same time and pursuant to the same terms as the combine, except for possibly the separate pricing; and (3) the notation on the purchase order that the header was modified to fit the combine. The only reasonable conclusion that can be drawn from these facts is that the "object-of-the-bargain" was a functioning combine and that the header was intended to be part of the bargained-for product, even if it was not to be used all of the time. The fact that the header was attached to the combine at the time of the loss further confirms this was the objective.

Albers also argues that the combine and header were two separate products because the header could be detached and other headers used for different crops. He analogizes the combine to a tractor, which often uses separately purchased implements.

At least one case has held that implements attached to a tractor were separate property for purposes of allowing tort recovery for damage caused by a fire originating in the tractor. Applying Idaho law, the federal district court in <u>C&S Hamilton Hay LLC v. CNH America LLC</u>, 2008 WL 504031(D. Idaho 2008) stated:

> This case is distinguishable from <u>Blahd</u>. The tractor and the attached implements do not constitute an "integrated whole." When dealing with a building lot and a house it is impractical to consider them functioning separately. The house is permanently connected to the lot. Such a relationship warrants a designation as an integrated whole and bars classification of the lot and house being separate property items. However in the current case, the attachments to the tractor were just that, temporary attachments which could easily be removed and used with another tractor. These implements were not permanently attached to the tractor in the manner that a house is permanently attached to its foundation and lot. Because a permanent connection between the tractor and the attached implements is lacking, the attachments constitute separate property and any damage to them constitutes "property damage."

<u>Id.</u> at *3.

The court concludes, however, that Albers's analogy to a tractor is, at best, an imperfect one. Tractors can be used for a variety of purposes, both with and without attached implements. This is

31

not true for a combine, which needs some sort of header to be practically functional. Consequently, what distinguishes the combine and header from a tractor and plow, for example, is that the header is an integral part of the functioning of the combine, which is not the case for a plow in terms of a tractor. When attached, the combine and header are physically and functionally one-integrated piece of equipment.

This leaves then those cases that take a more liberal approach to allowing for tort recovery for "component-to-component" damage. There are two reasons why these cases are of no help to Albers.

First, the court concludes that the North Dakota Supreme Court would not apply one of the more relaxed tests for allowing tort recovery for component-to-component damage. Rather, once it is concluded that the "object-of-the-bargain" is an integrated product and the component item causing the damage was a functional part of that product, such as the case here, that ends the matter. The court makes this prediction for the same reasons that the North Dakota Supreme Court would likely follow an "object-of-the-bargain" approach if it applies the "product/other property" dichotomy, *i.e.*, the court's prior decision in <u>Cooperative Power</u> and its embrace of the balancing of the tort and contract interests in <u>East River</u>.[5]

Second, even if the North Dakota Supreme Court was to adopt a more liberal test for permitting component-to-component damage, the facts of this case would not support allowing tort recovery in this case.

---

[5] The North Dakota Supreme Court would likely also conclude that the criticisms of the California approach have merit. In particular, critics argue that the vagueness of the factors to be considered makes the California approach difficult to apply and, for that reason, likely to lead to inconsistent results. Critics also argue that the approach makes the determination a question of fact in too many cases. Finally, critics argue that the approach has the potential for eviscerating the distinctions between tort and contract drawn by <u>East River</u> and its progeny. <u>See</u>, <u>e.g.</u>, <u>Jimenez</u>, 58 P.3d at 488-496 (Brown, J., concurring and dissenting).

The cases adopting a more liberal approach do not allow for tort recovery of "component-to-component" in all cases, but rather attempt to identify components that are sufficiently distinct such that a defect within the component would not invariably lead to damage to the remainder of the other components.  One of the many problems in applying a more liberal test in this case, and particularly California's approach, is identifying the component that is alleged to be defective and that constitutes the "product," such that the other components would then be considered "other property."  In this case, should it be the allegedly defective bearing? Or the "straw walker" that used the defective bearing?  Or should it be the combine, assuming the larger product to be the combine with the header?

In this case, it does not make any difference what Albers would point to as the defective component; the result would be the same.  Applying, the factors deemed relevant by the California cases, the combine is essentially the product itself, save for the attached header, and the bearing and the "straw walker" are not sufficiently distinct to allow for tort recovery to other components for several reasons:   The bearing and the "straw walker" are both integral to the functioning of the combine, and defects within either could invariably damage other components, including the possibility of damage caused by fire given the combustible environment (*i.e.*, heat, dust, and straw) within which combines operate.[6]   In addition, the "straw walker" is not a product that is sold separately from the combine.  Finally, if parts as common as bearings are considered sufficiently discrete, it would allow for tort recovery in virtually every case and eviscerate the distinction

---

[6]  While it may be just coincidence, the court has pending two other cases in which it is alleged that fires were caused by defects in Deere combines.  The plaintiff in Star Insurance Co. v. Deere & Company, Civil No. 1:07-cv-87, seeks recovery for crop damage suffered by neighboring farmers whose fields were burned.  In Doepke v. Deere & Company, Civil No. 1:08-cv-073, the plaintiff seeks recovery for burn injuries he suffered as well as for damage to the combine, crop loss, and other unspecified damages.

33

between tort and warranty as applied to purchased products.  As the court in <u>McFadden v. Dryvit Systems, Inc.</u>, 2004 WL 2278542 (D. Ore. 2004) noted in a different context:

> The defective component in <u>East River</u> was a failed first-stage steam reversing ring, which was part of a turbine unit the defendant manufacturer sold as a whole to the builder of the supertanker. It is easy to see that the defective product in that situation was the turbine as a whole, not the ring. Otherwise nearly every complicated piece of machinery that includes even so much as a defective screw could create liability in tort for vast amounts of economic losses, such as for the period of time a vessel with a broken turbine spends in port. If this were the rule, "contract law would drown in a sea of tort." <u>Id</u> at 866.

<u>Id.</u> at *20.[7]

### b.      The gasoline

Albers also argues that there was approximately $500 worth of gasoline in the combine at the time of the fire and that this constitutes "other property."  However, Albers has not cited to any case that supports the conclusion that consumables essential to the functioning of a product, such as gasoline, oil, and grease, should be considered "other property," and the court concludes there is no basis for such a conclusion.  Cf. <u>Sea-Land Service, Inc. v. General Elec. Co.</u>, <u>supra</u> (holding that replacement parts were not separate products because it was known at the time of the original purchase that the parts would have to be replaced); <u>Rich Products Corp. v. Kemutec, Inc.</u>, 66 F. Supp. 2d 937, 970-972 & n.31 (E.D. Wis. 1999) (denying tort recovery when the "other property" damage was *de minimus* and citing other cases reaching the same conclusion).  Obviously, given the number of products that use consumables, characterizing them as "other property" would subvert the policies behind limiting tort recovery when the only damage is to the product itself.

---

[7] The California courts have concluded that the issue of whether there should be tort recovery for component-to-component damage is, ordinarily, a question of fact.  Even if the North Dakota Supreme Court was to apply a more relaxed rule for allowing tort recovery for component-to-component damage, it is doubtful it would make the ultimate determination a question of fact in the manner suggested by <u>KB Homes</u> and California's pattern jury instruction.  But, in this case, it would not make any difference since no reasonable fact-finder could come to a different conclusion.

### 5.     Conclusion re the "product/other property" dichotomy

In summary, the court concludes that, even applying the "property/other property" approach, the  header and gasoline were not "other property" for which there can be a tort recovery under North Dakota law.  Consequently, Deere is entitled to summary judgment with respect to Albers's tort claims for this reason as well.

### E.     The consequences of a contrary conclusion in terms of tort recovery for damage to the combine

If the court is wrong about the header and the gasoline not being "other property" and tort recovery is permitted, Albers argues he is entitled to recover all of his losses, including the loss of the combine.   Essentially, his argument is that the economic loss doctrine does not apply whatsoever once there is injury to persons or "other property." While there is some support for this argument, C & S Hamilton Hay, 2008 WL 504031 at *4 (applying Idaho law);  Dutsch v. Sea Ray Boats, Inc., 845 P.2d 187, 189, 193 (Okla. 1992), it appears most courts would apply the economic loss doctrine to limit tort recovery for damage to the product, even when there is personal injury or damage to "other property."   E.g., Indemnity Ins. Co. of North America v. American Eurocopter, LLC, 2005 WL 1610653, *16 (M.D.N.C. 2005) (applying North Carolina law); Corsica Cooperative Association, 967 F. Supp. at 387 (applying South Dakota law); Fleetwood Enterprises, Inc. v. Progressive Northern Ins. Co., 749 N.E.2d 492 (Ind. 2001).

The parties have not cited to a North Dakota case that is on point and the court is not aware of any.  The court believes, however, that the North Dakota Supreme Court would follow the cases that apply the economic loss doctrine to limit tort recovery for damage to the product when there is personal injury or damage to "other property" because they are more consistent with the balancing of the tort and contract interests that the court found persuasive in East River.  Also, applying the

economic loss doctrine in this instance avoids turning these cases into a hunt for collateral damage, no matter how minor, as a justification for allowing tort recovery for damage to the product.  In the words of the Indiana Supreme Court, "An oil stain on a garage floor from a failed engine or a burnt blade of grass from a fire should not create a claim where none existed." Fleetwood Enterprises, Inc., 749 N.E.2d at 595.  Likewise, the same thing can be said for a twisted ankle in terms of a claim for personal injury.

## III.    BREACH OF WARRANTY CLAIMS

Under North Dakota law, "[a]n action for breach of any contract for sale must be commenced within four years after the claim for relief has accrued." N.D. Cent. Code § 41-02-104(1).  "In the case of a breach of warranty, the claim accrues when tender of delivery is made, unless the seller makes a warranty explicitly extending to the future performance of the goods." Superior, Inc. v. Behlen Mfg. Co., 2007 ND 141, ¶ 21, 738 N.W.2d 19; N.D. Cent. Code § 41-02-104(2).

In this case, no warranty was given, much less a warranty that would extend the four-year limitations period.  Consequently, Albers's breach of warranty claims are barred by the statute of limitations since this action was filed more than four years after the sale of the combine and the header.  Superior, Inc., 2007 ND 141 at ¶ 21; see also Marvin Lumber and Cedar Co. v. PPG Industries, Inc., 223 F.3d 873, 878-879 (8th Cir. 2000); Nelson v. Int'l Harvester Corp., 394 N.W.2d 578, 582 (Minn. Ct. App. 1986), overruled on other grounds by Lloyd F. Smith Co., Inc. v. Den-Tal-Ez, Inc., 491 N.W.2d 11, 17 (Minn.1992).

Alternatively, the court also concludes that Deere conspicuously and unambiguously disclaimed its implied warranties.  See  Hutton, 2000 WL 350260 at *4-5 (holding a similarly-presented disclaimer in a Deere purchase order to be conspicuous); Red River State Bank v.

36

<u>Reierson</u>, 533 N.W.2d 683, 687 (N.D. 1995).    Finally, Albers has not met his burden of demonstrating that Deere's unwillingness to be responsible for a used combine some four-plus years after its resale is somehow unconscionable.    <u>See</u> <u>Wallwork Lease and Rental Co., Inc. v. JNJ Investments, Inc.</u>, 303 N.W.2d 545, 548 (N.D. 1981); <u>cf.</u> <u>Hutton</u>, 2000 WL 350260 at *5.

For all of these reasons,  Deere is entitled to summary dismissal of Albers's warranty claims.

**IV.**    <u>**ORDER**</u>

Deere's motion for summary judgment (Doc. No. 3) is **GRANTED**.  Albers's complaint shall be **DISMISSED WITH PREJUDICE**.  Costs will not be awarded to the prevailing party given the closeness of the issues.

**JUDGMENT SHALL BE ENTERED ACCORDINGLY.**

Dated this 24th day of September, 2008.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge